**IN THE UNITED STATES COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| SHIYU JIN,<br>c/o Obed Law, PLLC<br>429 North Saint Asaph Street<br>Alexandria, VA 22314<br>           Plaintiff,<br><br>v.<br><br>JULIEN MERZOUG,<br>6501 Dearborn Dr.<br>Falls Church, VA, 22044<br><br>           Co-Defendant,<br><br>SEG MAGNETICS, INC.<br>2766 Via Orange Way, Suite A<br>Spring Valley, CA 91978<br><br>SERVE: Nevada Corporate Headquarters, Inc.<br>      4730 S. Fort Apache RD, Suite 300<br>      Las Vegas, NV 89147-7947<br>           Co-Defendant,<br>and<br><br>LEMON VIDEO, LLC,<br><br>SERVE:     INCORPORATE247, INC.<br>         5305 Limestone Roade, Suite 200<br>         <u>Wilmington, DE 19808</u><br>         JULIEN MERZOUG<br>         6501 Dearborn Dr.<br>         Falls Church, VA, 22044<br><br>           Co-Defendant. | Civil Action No.: 1:25-cv-1903<br><br>COMPLAINT FOR CIVIL VIOLATIONS OF 18 U.S.C. 1961 ("RICO"), FOR CIVIL BUSINESS CONSPIRACY UNDER VIRGINIA LAW, CONVERSION, BREACH OF ORAL/QUASI-CONTRACT, and UNJUST ENRICHMENT |

**<u>COMPLAINT</u>**

    Plaintiff Shiyu Jin, by and through counsel, submits this Complaint, and states as follows:

**<u>PARTIES</u>**

1

1.  Plaintiff Shiu Jin ("Mr. Jin" or "Jin") is in individual who is a resident of the People's Republic of China.

2.  Defendant Julien Merzoug ("Mr. Merzoug" or "Merzoug") is a resident of Falls Church, Virginia.

3.  Defendant SEG Magnetics, Inc. ("SEG") is a Nevada corporation that specializes in research and development related to the Searl® Effect Generator, with a principal place of business in California at 2766 Via Orange Way, Suite A Spring Valley, CA 91978.

4.  Defendant Lemon Video, LLC ("Lemon Video") is a Delaware limited liability company for which Merzoug is a principal member such that Lemon Video is a citizen of Virginia.

## JURISDICTION

5.  Subject matter jurisdiction exists because two of the claims arise out of federal law, and the state law claims arise out of the same nucleus of operative fact as the federal claims, and the there is diversity citizenship between the parties with the amount in controversy exceeding $75,000. 28 U.S. Code §§ 1331, 1367(a), 1332.

6.  This Court has personal jurisdiction over Defendants Julien Merzoug and Lemon Video, LLC by virtue of their residency in the State of Virginia.

7.  This Court has personal jurisdiction over Defendant SEG Magnetics, Inc. because SEG was in a conspiracy with the other defendants, participated in that conspiracy, and its co-conspirators undertook several overt acts in furtherance of that conspiracy in the Commonwealth of Virginia.

8.     Venue is proper because a substantial part of the events giving rise to the claims against the Defendants occurred within this judicial district in Falls Church, Virginia.  28 U.S. Code § 1391(b)(2).

## INTRODUCTION

9.     This case arises out of an intricate scam perpetrated by Defendant Julien Merzoug. Over the course of several years, Mr. Merzoug employed deceptive practices to gain the confidence of Mr. Jin.  Once gained, Mr. Merzoug exploited Mr. Jin by coaxing him to make investments on illusory projects via crypto transactions and then absconding with the funds for his personal use.

10.      The methods and means Mr. Merzoug employed to perpetrate his fraud resemble "pig butchering" schemes that have become all too frequent in frequent in crypto markets.

11.     According to the Financial Crimes Enforcement Network (hereafter FinCEN), this fraud, which has thrived in the crypto market,

> "resemble[*s*] the practice of fattening a hog before slaughter. The victims in this situation are referred to as 'pigs' by the …[offenders] who leverage fictitious identities, the guise of potential relationships, and elaborate storylines to 'fatten up' the victim into believing they are in trusted partnerships. The …[offenders] then refer to 'butchering' or 'slaughtering' the victim after victim assets are stolen, causing the victims financial and emotional harm." (FinCEN, 2022, p. 1). And see https://www.secretservice.gov/investigations/investmendfraud-pigbutchering.

12.     As set forth below, Mr. Merzoug engaged in precisely this type of scheme, one which cost Mr. Jin millions of dollars.

## BACKGROUND

13.     As is typical for victims of crypto schemes, the contact between Jin and Merzoug began online.

14.     On July 12, 2021, a user named Carla, who held herself out as a shareholder of SEG, informed Mr. Jin that he should meet a man named Julien (Merzoug), in the context of business and/or investment, who is and was a Director.

15.     Shortly after on July 12, 2021 Jin and Merzoug connected online, where Merzoug appeared from his home in Virginia. During their message exchange online, Merzoug informed Jin about "UEC", a cryptocurrency project that was based on SEG's technologies and related in some way with SEG. Merzoug made representations to Jin on behalf of SEG or for SEG in his role for the company, which Merzoug represented was chairman and largest shareholder.

16.     From their first meeting, Merzoug attempted to cultivate a close-friendship with Jin based, among other things, on similar spiritual beliefs. The initial discussions between Jin and Merzoug were more about relationship building than they were about business.

17.     Five days later, on July 17, 2021, Merzoug invited Jin to attend an inspection of SEG and UEC in San Diego on the condition that Jin make an initial of $100,000 to Merzoug's personal crypto wallet.

18.     On August 3, 2021, Jin transferred $100,000 via TRON blockchain to Merzoug's personal wallet. Merzoug had falsely represented that the funds were intended to be invested in UEC, a false statement Jin reasonably relied upon. Unless otherwise described herein, Merzoug's representations and communications took place in Virginia and, upon information and belief, continued to be from Virginia or primarily from his residence in Falls Church, Virginia.

19. On September 8, 2021, Jin offered Merzoug an investment allocation into Chronicle Media, an Australian blockchain project that Jin had cofounded.  In response, Merzoug transferred $25,000 for the investment opportunity.

20. Because U.S. citizens were not allowed to participate in the Chronicle Media project, Merzoug represented that he signed the investment term sheet under his wife's name. To date, however, Jin never received a copy of the signed agreement.

21. As in many crypto fraud schemes, where it is typical for the scammer to make small financial contributions to the victim as a tactic to build confidence, Merzoug's $25,000 contribution to Chronicle Media was a tactic to gain confidence from Jin in order to extract money from him in the future.

22. On September 14, 2021, Jin drove from Los Angeles to SEG's offices in San Diego.

23. At the meeting, Merzoug presented components of the SEG technology that, according to Merzoug, would be utilized in the UEC project. Merzoug did not, however, show Jin a prototype of the UEC technology because, according to him, he was protective of his technologies. Merzoug acted on behalf of SEG and SEG participated in the scheme to elicit funds from Jin. Jin met with CEO and Chief Scientist Fernando Morris and Jason Verbelli while visiting the factory.

24. After the meeting, and in an attempt to foster trust, Merzoug invited Jin to his Falls Church, VA residence.

25. Prior to his arrival at the residence, Merzoug made an additional $25,000 investment in Chronicle Media.

26. On September 22, 2021, Jin arrived at Merzoug's Falls Church residence where he stayed as a guest.

27. During this time, Merzoug proposed that Jin accompany him to Dubai to participate in an event organized by a crypto project called Daisy.

28. On September 24, 2021, Jin flew to Dubai with Merzoug and met Daisy's founders, Ilya and Eduard.

29. During the Dubai trip, Jin was introduced to Med, the CEO of Corpave/Ecologia, a Canadian project that Merzoug represented that he controlled.

30. On September 30, 2021, Jin and Merzoug flew back to Falls Church. Approximately one week later, Merzoug offered to sell Jin half his shares in SEG for $2.5 million, an offer Merzoug did not intend to keep as Merzoug intended to use any money received from the offer for his own personal benefit. After Jin informed Merzoug that he did not have the money, Merzoug told Jin that he would consider the $100,000 Jin transferred on August 3, 2021, as a partial payment, and that Jin could transfer the funds he had towards the stock purchase. In a clear attempt to further build Jin's confidence and trust, Merzoug informed Jin that the remainder of the payment could be made later.

31. Relying on Merzoug's representation, Jin transferred another $500,000 to Merzoug's personal wallet via Ethereum blockchain in early October of 2021 for shares of SEG.

32. During what Jin believed to be a partnership with Merzoug, it became clear that Merzoug did not have significant experience in technology-development. Recognizing this, Jin recommended to Julien that Shawn, an experienced scientist, be brought into the partnership.

33. Shawn was initially reluctant to join the partnership. He agreed, however, to travel to SEG's offices in San Diego to inspect the technology.

34. After inspecting SEG's offices and facilities, Shawn expressed doubts that the technologies he inspected would work. Despite this, Jin believed Merzoug was impressed by Shawn and was willing to foster a business relationship with him.

35. On November 6, 2021, Jin and Merzoug travelled to the Falls Church residence and discussed setting up a joint venture, JAMR Group, which would establish them as equal partners on all future projects.

36. During these discussions, Merzoug claimed that he had advanced $300,000 for Corpave/Ecologia of which $150,000 would be transferred to Jin. Merzoug claimed that the deal would be assumed by JAMR, which would result in Jin acquiring half of what Merzoug owned in Corpave/Ecologia.

37. To date, there is no evidence that Merzoug made the claimed investment in Corpave/Ecologia, let alone evidence that the investment was subsumed into JAMR.

38. Around this time, a friend of Jin, Esther, contacted Jin to pitch Agili8, her new AR Medicare project. Esther was looking to raise $2 million (AUT) in capital for the project.

39. While Jin was only willing to invest a small amount of money in the project, Merzoug expressed enthusiasm about the project and promised Jin that he would eventually be able to fund the entire $2 million. Merzoug, however, made no offer to invest in the company in the short term.

40. Due to his prior financial contributions to Merzoug, Jin lacked the liquidity to invest in Agili8. Recognizing, however, that funds would be necessary to operate Agili8, Jin proposed liquidating his pre-IPO shares of Soar, an Australian mapping company. To facilitate this transaction, Merzoug convinced cofounders of D.AI.SY, Ilya and Eduardo, to each purchase 71,429 shares in Soar for $250,000.

41. On or around November 21, 2021, Ilya and Eduardo each signed share transfer agreements granting each of them 71,429 shares of Soar in exchange for $250,000.

42. On December 30, 2021, Jin transferred $500,000 (AUT) to Agili8, the first tranche of the investments in the company.

43. At the time, JAMR Group had not been incorporated. Jin, therefore, used his personal Singaporean company, Aurumsy, to sign the agreement that resulted in the transfer of $2,000,000 AUT to Agili8.

44. Around this time, Jin managed to convince Shawn to quit his job, travel to Virginia, and join JAMR Group as a business partner who would be charged with leading all technical development.

45. On December 1, 2021, Merzoug proposed buying the property at 2963 Sleepy Hollow Rd., Falls Church, VA 22044, which would be utilized for home and office purposes. Since neither Jin nor Shawn had the funds to purchase the property, Merzoug borrowed $1 million from Eduard to purchase the property.

46. On December 3, 2021, Shawn arrived in Falls Church and moved into the new house with Jin. Around this time, Merzoug agreed to Jin's proposal to make Shawn an equal-partners in JAMR Group, as well as a partner in deals preexisting the formation of JAMR Group.

47. That same day, Ilya transferred $250,000 to acquire the Soar shares. Six days later, on December 9, 2021, Eduardo made the same transfer.

48. On December 20, 2021, Merzoug proposed buying a Canadian factory from his friend Julien Peloquin, which he represented was worth millions. Merzoug asked Jin to fund $265,000 for the purchase and represented that would cover the balance. Jin agreed and transferred $265,000 to Julien's personal wallet.

49. Upon information and belief, Merzoug never paid the remaining funds necessary to purchase the factory and Merzoug's offer was falsely made in hopes of receiving $265,000

from Jin for which Merzoug never planned to use the money as represented, instead Merzoug planned to use the money for his personal gain.

50. On December 27, 2021, Shawn, Jin, and Merzoug began work on a new social media application called Alulu. By their agreement, Jin would serve as CEO, Shawn as CTO, and Merzoug as the officer charged with acquiring investment and resources for the company.

51. The entity charged with developing Alulu was Lemon Video, LLC, a company organized under the laws of the State of Delaware that was wholly owned by sole member Merzoug.

52. On December 30, 2021, Jin transferred $500,000 AUT from his Singaporean company to Agili8 as the first tranche of investments out of the $2 million AUD that had been committed. Even though JAMR Group had committed to this investment, Merzoug did not contribute any funds towards the investment.

53. In fact, Merzoug regretted his commitment to Agili8 shortly after the agreement was signed and eschewed all efforts to obtain the funds to satisfy the promised investment. As a result, Jin was forced to reconcile with Agili8 by raising 25% of the valuation at which Aurumsy invested.

54. On January 4, 2022, JAMR Group was formally incorporated in the State of Delaware. Under the governing documents, Merzoug was the sole owner of JAMR Group.

55. Thereafter, Jin and Shawn expended enormous efforts to develop the project. He outsourced UI/UX design work to a team in Ukraine, and Shawn relocated an engineer from Seattle to Virginia to work on the project. Additionally, Shawn hired three engineers in China under Jin's Bejing Company.

56. Merzoug, in contrast, was uninvolved in the daily operation and development of the project.

57. As he represented on multiple occasions, Merzoug considered his role on the project as finding investors. Indeed, Merzoug represented to Jin that he had extensive relationships with persons in the UAE, including the Dubai ruler and princess, from whom he could obtain $30 million the first year and $70 million the next. Upon information and belief, those representations were false.

58. In February 2022, Merzoug stated he wished to terminate his role on Alulu and his business relationship with Jin more generally. To effectuate the termination, he offered to divest himself of all but 5% of the equity in Lemon Video in exchange for Jin and Shawn agreeing to let him walk away.

59. Jin and Shawn managed to convince Merzoug not to quit the project and to remain in the partnership.

60. During this time, Merzoug was not generating any investment into Alulu and, upon information and belief, made no effort to obtain investments.

61. As a result, Jin was forced to pay over $50,000 a month towards the operating costs of Alulu, including the employee salaries.

62. In March 2022, it became apparent that Merzoug was actively turning Shawn against him. Jin warned Shawn that Merzoug appeared to be intentionally sowing discontent and distrust among the three. When Shawn informed Merzoug about Jin's warning, Merzoug became irate and completely severed his business relationship with Jim.

63. Around this time, the operational costs of Alulu were placing a significant financial burden on Jin. To avoid insolvency, Jin was forced to quit Alulu and allow Merzoug to manage the business.

64. Shortly thereafter, Jin's Alulu email was deleted, without notification, and his phone number was removed from the company cellular plan. Similarly, Jin lost access to Alula's workspace and other systems, without notice.

65. Even though Merzoug expressly had agreed that he, Shawn, and Jin were equal shareholders of Alulu, Merzoug registered the company under his name as the sole shareholder. As a result, Shawn's voluntary termination of his employment left him without any financial interest in Alulu.

66. At this time, Merzoug did not completely cease all communication with Jin. Indeed, after Jin walked away from Alulu, Merzoug told Jin that he would reimburse Jin for the operational expenses he had incurred at Alulu. He further promised Jin that, once an expected $30 million investment was made, he would compensate Jin $2 million.

67. After Jin walked away from his position at Alulu, he learned that Merzoug had not brought in any investments in the company. Believing that he still had an equity interest in Alulu, Jin continued to pay the yearly operational costs of Alulu, which totaled over $100,000.

68. Although Jin tried to bring find investors from his network, he was met with resistance from Shawn who believed that Merzoug's promised investment from the United Arab Emirates ("UAE") sounded more reliable and assured.

69. On April 29, 2022, Merzoug informed Jin that he intended to cancel Jin's US mobile number, which was under Merzoug's company even though Jin's had offered to pay him directly to maintain the number.

70. Around this time, Jin asked Merzoug why Merzoug had removed him from Telegram groups, removed his access credential to online banking, and blocked his

access to the project codebase. In response, Merzoug stated that the business relationship had terminated due to alleged lies Jin had told. Merzoug, however, did not identify the particular lies Jin had allegedly told, but rather indicated that he would confront Jin about those lies at a later date.

71. During a phone call on May 4, 2022, Merzoug and Jin discussed the terms on which they would sever their business relationship. Jin offered to give up his half of Merzoug's ownership in Ecologia, in exchange for four months salary and reimbursement of his expenses at Alulu. Jin further requested an exit from SEG/UEC and from the Canadian factory project.

72. In response, Merzoug made the following promises:

   a. He would sell the Canadian factory, which Merzoug claimed would result in Jin not only recouping his investment, but also acquiring shares in the company.

   b. He would pay Jin back for his investment in SEG, as well as grant Jin some shares in SEG due to Jin's efforts in spearheading the SEG/UEC project.

   c. He would pay Jin for his investment in the Sleepy Hollow property once the building was completed.

   d. He would be receiving $50 million from a UAE and an Indian friend to be invested in Alulu, after which Merzoug would compensate Jin for his investment along with an extra $2 million.

73. As of this date, Merzoug failed to perform on any of these promises.

74. During a November 9, 2022, phone call with Jin, Merzoug informed Jin that Alulu was not doing well.

75. Jin and Merzoug had another phone the next day.  During the call, Merzoug made the following representations:

    a.  He had spent all the money Jin had transferred to him.

    b.  He needed liquidity for his new business and asked Jin whether he had an interest in investing.

    c.  He had invested $300,000 of his own money in Alulu, but that he would not have any updates from Alulu before January 2023.

    d.  There remained large amounts of toxic material in the Canadian factory, which had to be cleaned up before he could sell the property.

    e.  He had invested $3.5 million in the Canadian factory and that he would definitely have the proceeds of the sale by March 2023.

    f.  When asked about Jin's share in the Canadian factory, Merzoug acknowledged that Jin had invested $250,000 in the property and that, at the final sale, the proceeds would be distributed proportional to the investment.

    g.  While acknowledging that he had previously represented that he had invested in Agili8, he had not, in fact, made such an investment.

    h.  When asked why he had not reimbursed Jin for his investment in Alulu despite claiming that he had obtained new investors, he noted that Jin had no ownership interest in the company, that the money Jin had invested in Alulu was his money, and that his obligation to reimburse Jin should be his personal obligation rather than Alulu's.

i. When asked to describe the worst-case scenario in the event Alulu ceased operations, he responded that he would not allow the company to close even under its present condition, which he blamed on Shawn.

j. When asked about the large SEG/UEC project, Merzoug said he had found a company willing to invest in the project that had purchased shares at a par value of $150 and that Jin's investment would eventually be worth billions.

k. When asked to provide copies of documents related to the investment, he stated that Jin did not need documents and that the investment would be finalized by January or February of 2023.

l. When asked about how Jin had raised the $2.5 million for the Agili8 project even though Jin had only invested $600,000, Merzoug responded that, if Jin pushed the issue, he could only receive $150 dollars per share.  In contrast, if Jin was patient and let him deal with the money, Merzoug would return Jin his own shares worth $600,000.

m. When asked if Jin could get his money back, Merzoug refused and said returning the money would be impossible.

n. When Jin offered to deduct his investment in Alulu from Shawn's investment in Agili8, he refused and accused Jin of being "selfish."

76. On November 11, 2023, Merzoug called Jin to discuss Shawn's alleged resentment towards Jin.  Upon information and belief, Shawn harbored no such resentment.  Rather, Merzoug's statements during the call were intended to induce a feeling of insecurity in Jin, thereby facilitating Merzoug's exit from the scam.

77. During a phone call on November 25, 2022, Merzoug represented, as follows:

a. He still owed $2.7 million on the Canadian factory and, therefore, was unable to compensate Jin for his investment.

b. He was unable to sell the factory due to the immovability of the toxic material.

c. He paid only $500,00 to purchase the factory, not $2.5 million as he previously represented.

d. Because the owner of the Canadian property, Julien Peloquin, was in a coma, he was dealing Mr. Peloquin's partner in Canada.

e. He stated that Mr. Peloquin was the owner of certain paintings worth $1.5 million, thereby contradicting his earlier statement that they were worth $5 million.

f. He was going to put Alulu on hold in January 2023, and that Shawn planned to leave Alulu and find a new job.

78. During a phone call the next day, Merzoug denied that the work Jin invested in Alulu as the company never got off the ground despite Jin's investment.

79. During a phone call on January 8, 2023, Merzoug suggested to Jin that Merzoug believed Jin may have abused his daughter in December 2021. The accusation/suggestion was patently false and, upon information and belief, was made solely to facilitate the severance of his relationship with Jin and his exit from the investment schemes he perpetrated.

80. During a phone call on May 1, 2023, Merzoug represented to Jin as follows:

a. Alulu was closed and that, due to Jin's actions, Merzoug was left with a massive debt.

b. Because there were no new investors in SEG, but he was willing to issue shares to Jin that would be worth a significant amount in the future.

c.  The prototype of SEG would be ready in 8-12 months.

d.  When asked why he had misused Jin's $600,000 investment in SEG, Merzoug acknowledged that he had used the investment to pay back 42 investors in UEC.

e.  Merzoug proposed altering the nature of Jin's investment from a purchasing of Merzoug's shares of SEG to investing directly into SEG.

f.  If Jin was insistent on receiving a refund, he could only do so after one year, with 5% interest, and promised to send a promissory note. This was a promise by Merzoug to repay Jin for the $600,000 Jin provided to him.

g.  Merzoug was still spending approximately $80,000 per month on SEG's expenses, and further, that he spent $300,000 on SEG's CEO, Fernando's, cancer treatment.

h.  The Canadian factory that Jin invested in still needed additional time for the venture to be profitable, and that the property needed a further investment of $700,000 to remove toxic materials from the property, as stipulated by the Canadian government. Until this environmental issue was fixed, Merzoug would not be able to pay Jin back. However, Merzoug effectively offered to repay the $265,000 Jin had provided for investment in the Canadian factory once he could make the repayment.

i.  Merzoug was traveling to Canada on May 28 to resolve the environmental issue, after which he would proceed to formally record Jin's interest in the Canadian factory. Jin's paperwork was never confirmed or provided.

j.    Merzoug repeatedly spoke on behalf of Shawn, claiming Shawn refused to communicate or deal with Jin regarding SEG and Alulu matters. When Jin requested Shawn's direct involvement in calls, Merzoug refused to include him.

k.    Merzoug made baseless accusations against Jim, including blaming Jin and Shawn for $300,000 in losses on a house due to excessive air conditioning causing damage repair fees.

81. Merzoug's representations as to what he used money transferred to him from Jin demonstrate that Merzoug may have owed other individuals money based on similar false promises of investment opportunities, not dissimilar to "Ponzi" schemes, always requiring obtaining funds from a new source in order to avoid discovery of the deceit or scheme by investors or business partners.

## COUNT I— CLAIM UNDER THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. 1961, et seq. ("RICO")

82. Jin incorporates by reference all previous allegations as though fully set forth herein.

83. Merzoug and SEG worked together first to make an introduction between Jin and Merzoug, then to establish trust and legitimacy for Merzoug's financial wherewithal in order to induce Jin to transfer money to Merzoug.

84. Jin relied upon the belief that Merzoug and SEG had legitimate business or investment opportunities for him that was falsely portrayed to Jin.

85. Merzoug used Lemon Video to further establish a relationship with Jin in order to procure further funds from Jin and in order to avoid suspicion or concerns about how Merzoug used Jin's money and to avoid suspicion or concerns about the legitimacy of Merzoug's financial representations.

86. After the November 10, 2022 and November 25, 2022 phone calls between Jin and Merzoug, it was clear that Merzoug had made false representations to Jin regarding what his money would be used for and Merzoug's financial involvement with SEG and Alulu (through Lemon Video).

87. Merzoug's concerted effort to use SEG and Alulu (through his ownership of Lemon Video) as tools to procure funds from Jin constituted an "enterprise" because Merzoug, SEG, and Lemon Video were associated together for the common purpose of procuring money from Jin under a guise of investment and business so as to avoid suspicion of fraud or deceit.

88. Jin suffered damages in the amount of his monetary/asset transfers to Merzoug or for the benefit of Merzoug, money spent for the benefit of SEG and Alulu, and personal expenses and costs incurred in seeking "opportunities" with Merzoug, SEG, and Alulu, all totaling more than $1,100,000USD.

89. Jin's damages were caused proximately and directly by Defendant's soliciting of funds, misrepresentations regarding business ventures, financial wherewithal, and promised returns known to be false or not able to be fulfilled made by electronic transmission from Virginia to China resulting in a pattern of fraudulent procurement of funds from Jin and conversion of such funds from the stated intended purpose to personal use of funds procured by Merzoug.

90. Defendants worked in concert to establish a scheme where Merzoug would gain Jin's trust using SEG as a backdrop for credibility, while using ownership in Alulu to develop a purported working "legitimate" relationship with Jin, but in reality using funds transferred for personal gain.

91. Defendants used misrepresentations regarding assets in foreign countries with the use of telegram international correspondence, and the use of international crypto transfers and banks to further perpetrate the scheme against Jin.

92. Use of references to foreign companies and projects, together with targeting of Jin (residing in China), and use of cryptocurrency transfers insulated the scheme from scrutiny and made discovery of the scheme difficult.

93. Merzoug and Defendants' scheme against Jin was willfully and intentionally orchestrated to procure hundreds of thousands of dollars from Jin and to avoid scrutiny and escape recourse.

94. Defendants' scheme included a pattern of claiming that Jin would and could receive his money back and/or more valuable returns from purported investments based on Merzoug's assertions that SEG and other projects were highly valuable and money could be obtained within a reasonable time in the future.

WHEREFORE, for Count I, Plaintiff requests this Court enter judgment against Defendants, jointly and severally, and award Plaintiff not less than $5,000,000 in damages (or an amount to be determined at trial) comprised of compensatory damages, treble damages pursuant to 18 U.S. Code § 1964(c), punitive damages, reasonable attorney's fees, costs, pre and post judgment interest, and such other relief the Court considers just.

## COUNT II (Statutory Business Conspiracy Claim (Va Code §18.2-499))
### (against all Defendants)

95. Plaintiff incorporates by reference all previous allegations as though fully stated herein.

96. Defendants' scheme caused damages to Plaintiff in the form of money/funds provided to Merzoug, lost payments made by Plaintiff for SEG and Alulu, personal expenses, and lost business opportunities promised by Merzoug but not provided to Jin.

97. Merzoug operated primarily out of Virginia from his Falls Church residence, where he made pertinent communications and directed funds to be transferred amongst various accounts.

98. Defendants' scheme was perpetrated intentionally, purposefully, and without lawful justification, constituting legal malice, with the intent to damage Plaintiff's business endeavors and damage Plaintiff financially, while benefiting Defendants, in particular Merzoug.

99. Defendants perpetrated the scheme in part by tortiously interfering with Jin's business relations, notably Aurumsy, Agili8, Alulu, and as otherwise alleged herein and by fraudulent inducement of funds from Jin and conversion of such funds for Merzoug's own benefit.

WHEREFORE, for Count II, Plaintiff requests that this Court award Judgment against Defendants,  jointly and severally, and award Plaintiff not less than $5,000,000  in damages (or in an amount to be determined at trial) comprised of compensatory damages of $1,100,000, treble damages thereon pursuant to Va. Code § 18.2-500(A), punitive and exemplary damages, reasonable attorney's fees, costs, pre and post judgment interest, and such other relief the Court considers just.

**COUNT III: CONVERSION (against Merzoug only)**

100.     Plaintiff incorporates by reference all previous allegations as though fully stated herein.

101.     Merzoug solicited and accepted $865,000USD in funds from Jin, $600,000 as an investment into SEG, and $265,000 into the Canadian factory.

102.     Merzoug did not invest the funds as agreed upon and intended, but rather exercised personal control over the funds, using such funds for his own personal benefit, retaining such benefits in Virginia or otherwise directing funds to be transferred between various accounts from his residence in Virginia.

103.    Merzoug's used the funds to the exclusion of Jin's right to have the funds used as investment into SEG and the Canadian factory venture.

104.    Merzoug had no right or justification to use or control the funds outside of the intended purpose.

105.    Merzoug's conduct was so willful and wanton as to show a conscious disregard for the rights of plaintiff.

WHEREFORE, for Count III, Plaintiff requests that this Court award Judgment against Defendant Merzoug in an amount to be determined at trial, not less than $865,000 plus interest, punitive damages of not less than $350,000, exemplary damages to deter future conduct, actual damages, and reasonable attorney's fees.

### COUNT IV (BREACH OF ORAL/QUASI-CONTRACT) (against Merzoug only)

106.    Plaintiff incorporates by reference all previous allegations as though fully stated herein.

107.    In exchange for Mezoug's offer of investment into certain business ventures on two occasions (SEG and the Canadian factory), Jin provided Merzoug $865,000.

108.    Merzoug prevented Jin from learning that the $865,000 was not used for the expressly agreed upon purpose of investment into SEG and the Canadian factory.

109.    Jin reasonably relied upon Merzoug's representations that the money was invested as intended and did not learn of the breach until November 10, 2022 when Merzoug admitted that the money had been used by Merzoug for other ventures.

110.    Merzoug promised to repay Jin the $865,000 in 2022 and 2023, but failed to do so.

111.    As a direct consequence of Merzoug's use of the funds for other purposes, Jin has been damaged in the amount of $865,000 in damages, additional consequential damages to be proven at trial, attorney's fees, and interest.

WHEREFORE, for Count IV, Plaintiff requests that this Court award Judgment against Defendant Merzoug in an amount to be determined at trial, not less than $865,000 plus interest, consequential damages, interest, court costs, and reasonable attorney's fees.

### Count V (UNJUST ENRICHMENT) (against Merzoug only)

112. Plaintiff incorporates by reference all previous allegations as though fully stated herein.

113. In exchange for Mezoug's promise to provide Jin investment into certain business ventures (SEG and the Canadian factory), Jin provided Merzoug $865,000 over three payments.

114. Jin's provision of $865,000 was with the reasonable expectation of repayment and/or return on investment.

115. Merzoug prevented Jin from learning that the $865,000 was not used for the expressly agreed upon purpose of investment into SEG and the Canadian factory. Jin reasonably relied upon Merzoug's representations that the money was invested as intended and did not learn of the breach until November 10, 2022 when Merzoug admitted that the money had been used by Merzoug for other ventures.

116. Merzoug was unjustly enriched by $865,000, the amount Jin provided Merzoug, who retained the benefit of such funds in Virginia by virtue of his residence in Virginia.

117. As a result of the expectation to compensate Jin for the $865,000 investments, Merzoug made promises in 2022 and 2023 to repay Jin as alleged herein. Merzoug failed to repay Jin.

118. As a direct consequence of Merzoug's use of the funds for other purposes, Jin has been damaged in the amount of $865,000 in damages, additional consequential damages, attorney's fees, and interest.

WHEREFORE, for Count V, Plaintiff requests that this Court award Judgment against Defendant Merzoug in an amount to be determined at trial, not less than $865,000 plus interest, court costs, and reasonable attorney's fees.

Dated: October 30, 2025        SHIYU JIN, Plaintiff
*By Counsel*

                            /s/Seth Obed
Seth James B. Obed, VSB #82482
OBED LAW, PLLC
429 North Saint Asaph St.
Alexandria, VA 22314
[t](703)567-4052; [f](703)894-4940
sobed@obedlaw.com

## **JURY DEMAND**

Plaintiff requests a jury trial on all counts so triable.

Dated: October 30, 2025        SHIYU JIN, Plaintiff
*By Counsel*
                            /s/Seth Obed
Seth James B. Obed, VSB #82482